Good morning. May I please report? I'm Douglas Wilson on behalf of the United States. Federal Rule of Criminal Procedure 41 is not intended to provide a remedy of suppression. Instead, the purpose of the rule is to allow a person aggrieved by a search to obtain access to materials seized during that search after the search has occurred. It is not intended to extend as far as the exclusionary rule. And this Court has made clear that exclusion is normally not an acceptable remedy under Rule 41. Instead, the government should be allowed to retain documents that it obtains in a search if it has an investigative need for those documents. Why is that? I'm having a hard time understanding that. Let's assume that was a blatantly illegal search. Where does that come from, the notion that you can keep material that you should never have had to begin with? Well, it comes from the language of the rule, which has eliminated the exclusionary rule. When the rule was amended in 1989, the Supreme Court in Congress specifically eliminated the exclusionary rule. And the reason it did that was because exclusion depends upon many factors that occur during the course of an investigation and a prosecution, such as, and they're subject to numerous exceptions, such as the good faith exception, the fact that exclusion is normally not available in a grand jury proceeding, the fact that excluded evidence can normally be used to impeach the defendant during trial. Are you arguing that material can never be ordered returned under Rule 41, or merely that there's a high standard? Well, Your Honor, the committee notes for the amendment state that in extreme cases, evidence can be suppressed under Rule 41. But the example that the committee used is a situation in which a search is completely illegal and the government has willfully refused to restore or return evidence that was obtained. The discussion has used two words, return and suppress, kind of back and forth interchangeably. In the Rule 41 uses that I've seen in the past, the evidence gets returned if the government doesn't need it anymore, but the government retains photographs, Xerox copies, whatever is necessary to preserve the evidentiary value of the evidence, even though it's returned. So, for example, if a third party's truck has been taken in a murder investigation and the owner of the truck isn't suspected of having anything to do with the murder, the truck will get returned, but after it's been checked for blood and fingerprints and all that. Are you saying that the truck doesn't have to be returned? No, Your Honor, I'm not saying that. I'm saying that normally Rule 41 is satisfied by giving the defendant, the search party, copies of documents or copies, in this case, of computer files that were seized. Why wouldn't the government keep the copies and just return all the originals to the owner? That's the determination that the court has to make as part of the Rule 41 calculus. If the government has a superior need for the originals and can justify that as part of its investigation, then it should be allowed to keep the originals. But you didn't go to a neutral arbitrator on this, like a magistrate judge, to determine whether the government had a need to retain information on these additional players, did you? Well, Your Honor, that's what happens during a Rule 41 motion. So, yes, it does go to a neutral arbiter. I know it's supposed to, but I didn't think you did in this case. Well, we obtained a search warrant to seize the materials, and then when the movement filed a Rule 41 motion, that went before magistrate judges and district judges to determine, to make the Rule 41 analysis. And by that point, though, hadn't Agent Nowitzki already determined that there were approximately 100 and something additional players that may have used substances and was pursuing whether something should be done with respect to that? Agent Nowitzki relatively quickly, after the first EDT search, examined the files to determine whether any fell within the warrant and used information from those files. What troubles me about this, I mean, you could take this example, you could have somebody on a high school team, for example, and you'd be looking at local gang activity or something, and suddenly you have the medical records of all the high school team, and the government can rummage through all of this, and then later on say, well, you know, we, just an accident. Don't we have a, to use the law school term, a slippery slope here if we agree with the government's position? No, Your Honor, I don't think so. We had a warrant to seize these documents. You had a warrant to seize the documents related to the 10 players. That's correct. But not with respect to all of the rest of them, did you? The warrant was limited to the 10 players. I have a question about how the 10 players information relate to all the other information, and it stems from ignorance of how computers work. Is this akin to a file on John Doe that's kept in a drawer where you can just pick out John Doe's file and there's no need to look at the rest, or is it more akin to a sheet of paper saying my 100 friends who have robbed banks and John Doe's listed on there and there's only one piece of paper, so that to get it you have to see the others? In this case, the latter, Your Honor. This case basically gets down to one document seized off the so-called Tracy Directory. That document contained the names of some of the so-called BALCO players, the 8 or 10 at issue, as well as the other 100 plus players who tested positive. It was a document or it was a spreadsheet? Was it like a WordPerfect sort of a document or what was it? The excerpts are confusing. We have pieces of paper there, but you can't figure out what they are. I believe it was a spreadsheet, Your Honor. It was a spreadsheet. Yes. And it was discussed by Judge Ilsen in a hearing. That's correct, Your Honor. And she pointed out, as I read her testimony, her comments, her findings, that the spreadsheet, when first put on the computer, showed only the names of the BALCO players and their teams. And by that, you could tell that over 100 of them were not the 10 BALCO players. In order to find out what the results were on the remaining part of the spreadsheet, it was necessary to activate a scroll bar at the bottom of the picture and move to the right so that you could see what the test results were. That was a volitional, intentional act. The results were not in plain view when the spreadsheet was first put on the machine. Have I said it correctly? It's correct that when you – well, let me answer it with two answers, Your Honor. First, because we're talking about a single file here and it included some of the BALCO players, we believe we could seize that pursuant to the terms of the warrant in total without having to – But it was possible – it was possible, was it not, by using the find function, simply to go to the names of the BALCO 10, let's call them BALCO 10, and simply see what was on the line for those BALCO 10 without seeing what was on the line for the rest of them. But that's simply an accident of technology, Your Honor. We could – It's not an accident of technology. It's what it was. If that were the case, Your Honor, we'd simply buy large monitors for all of our agents and we may open a spreadsheet that would appear in the entire document. I mean, in addition, documents – the fact that, you know, this agent used a document that may have only brought up a third of it or a half of it can't be determined in a Level IV Amendment issue. But that really gets beyond the issue of the volition here. The agent – I'm sorry, Agent Novitski said to Judge Mahan, and I quote, they wanted to give the opportunity to, in quotes, pursue it, to peruse it, to, in quotes, to see if there was anything above and beyond that which was authorized for seizure in the initial warrant. This was a volitional act by the government. This was not a computer accident. But it's one document, Your Honor. It's one document that contains information within the warrant. But it gave you the names of the additional players, right? That's correct. And we submit that the document was feasible pursuant to the terms of the warrant. No matter if there are – let's say that half the players on there were using steroids, according to these tests. Is it the government's position that even though it had a warrant to look at the information about the 10, that it could take all that additional information and do whatever it wanted according to what was said to Judge Mahan? If the information is contained within a single document that can be printed out with one click on the print icon, that would have been considered a warrant. But it doesn't fit a plain view model that you had a click on. I mean, by your own attestation, it's like opening a drawer. You couldn't simply just look, right? Your Honor, our submission is that we don't have to get the plain view for this. This document, the document that was used to get the later quest warrant, is within the scope of the warrant because it contains the 10 BALCO names. Have you abandoned the plain view argument? I mean, the panel opinion that's now been withdrawn really doesn't rely on the plain view argument. We don't believe we have to, Your Honor, because it's a single document. When you talk about a single document, though, on a computer, a single document can contain vast amounts of data. Well, this is one spreadsheet, Your Honor. This is not a document. You acknowledge that the warrant didn't allow you, on its face, to get information about people other than the 10 people. That's correct, Your Honor. But you did that. If this information had been printed out in the document or if the spreadsheet had been in a file, we could have seized the entire spreadsheet. You could have seized it, but the question is, what would you have pursued the information that was on it, which would have entailed careful attention to what was on it and then pursuing it down the line? I mean, that's really what you're saying. You're saying we could actually not only look at it and see the names that we were supposed to look at, but we could look at everything else on it and use it as if we had a complete right to it. If the government has the right to seize a piece of evidence, then it may use that evidence to the fullest extent of the information contained. I thought you said before we don't have to get to how it can use the evidence because the suppression of evidence is not a subject of Rule 41. Well, that is our primary submission. Now you're asking us to decide how it can use the evidence. Your Honor, our primary submission is that the court succeeded as authority under Rule 41 in this case. Can I ask a Rule 41 question? Does the government have an ongoing need for the urine samples and the documentation? Yes, Your Honor, we do. We have an ongoing investigation of illegal distribution of antibiotic steroids, and if we can get hold of that information, we'll use it to further that investigation. Could you help me with a practical problem here? I'm sorry, it looked like there was follow-up. Help me with a practical problem. Quest does most of the medical testing in Fairbanks, and I don't know how they organize their spreadsheets, but I imagine if the FBI was looking at a spreadsheet of test results that related to Fairbanks or related to cholesterol or any number of things that they test for, it would turn up a long list of people. If the government has an interest in somebody else, and the agent happens to be interested in, say, Kleinfeld, oh, I know who he is, does that mean he can look at my results, my wife's results at Quest? Well, Your Honor, if we have a warrant, and the records are kept in that fashion, and your records – if we have a warrant for your records, Your Honor, then I think –  Well, somebody has nothing to do with me in any way. It's just that mine is entertaining because he recognizes the name in Quest's records. It was CDT's choice to keep the records in this fashion. Medical records are often, if not – Now you're just saying it's not our fault. You're not saying they can't look. They can look, Your Honor. If it's on the same document, they can look. If they're interested in the baseball players' records, and other people also have blood and whatnot at Quest, and their names are entertaining to the FBI agents, the FBI agents can look. If it's on the same document, yes. If we have a single document, if CDT or Quest has chosen to keep a list, which is what happened here – Well, it sounds as though your position is not only you can look, you can keep it, and then you can use Judge Kleinfeld's name if it's discovered. I'm now using this as a hypothetical that gives you probable cause. You can then use it for a later warrant against Judge Kleinfeld. That's, I think, your position. Feeding too many Big Macs. If the documents are kept together on a single list, we've validly seized that list. Seize the list, keep the list, and use it as a basis for another warrant against Judge Kleinfeld. That's correct, Your Honor. If I could backtrack one minute. My understanding is that the 41-G order by Judge Elston is not before us, and the 41-G issue order by Judge Cooper is not before us. We withdraw our information that we found. So the only one that's before us is the one at the very end of the line, Judge Mahan's order, right? Now, why isn't that, most of the findings that underlay that, preclusive against the government because of the other two orders, such that there really isn't much left of this issue that we're looking at because Judge Mahan was dealing with an assumption that the other two warrants were overbroad and that the searches underlying them were invalid, rather than that that was why he was ordering the return of the specimens that were seized as a result of this very last warrant. Why do we even get into most of it, in terms of your list, for example? Your list was already determined to be invalid, as I understand it, back at the beginning of the line by Judge Cooper. And so why are we looking at it down here at the other end? It wasn't at the beginning of the line, Your Honor. Judge Mahan ruled before Judge Cooper ruled. And in any event, the information was taken from the CDT Tracy directory and used to obtain the quest warrant for the 116 drug players long before anybody ruled. So really we have a question of the validity and the legality of that search, whether that search was unlawful and therefore the fruit of that search used in the quest warrant. I'd like to quickly clarify one thing. Judge Wardlaw asked you earlier if you were abandoning the plain view argument, and your answer was unclear to me. It's clear that your at least primary argument is a different one. But have you abandoned that, or is it an alternative argument, or what is it? Well, Your Honor, if the court concludes that we can't seize and use a list that contains information within a warrant, then, yes, we would say that that further information about the other players was in plain view because a positive drug test establishes probable cause to believe that a violation of federal criminal law has occurred. So I had thought it was a relatively settled doctrine that if we have probable cause to seize a document, we can seize the entire document and use it. But if we needed to rely on plain view to seize a document. Let's talk about documents. Documents, as traditionally known, is a piece of paper or a series of pieces of paper that are somehow unified as being part of a, could be numbered in a particular way or as a sequence of words. When it comes to computers, it's quite a bit more complicated, especially as an application. It's not a document. It's a program, right? In this case, it's a spreadsheet, Your Honor. Before this court, it's a spreadsheet. That's very helpful. A spreadsheet is a spreadsheet. A spreadsheet can be printed out as one document. A spreadsheet is an application, isn't it? It's a program. It's an application. It's something that takes data and… Arranges it. Arranges it in a certain way. Yes, Your Honor. And the data doesn't have, I mean, the data says ones and zeros on a hard drive. Not necessarily, I mean, it could come from all sorts of places, right? A spreadsheet can gather information that spans, if you went to this particular, let's say you went to a particular name, that could be a file, a separate file that would then be pulled up by the spreadsheet application, right? I suppose it could be, Your Honor. The spreadsheet could just be created by data entered into that spreadsheet application. In other words, the spreadsheet could be created from data… Well, you talk about a single document, right? And if the document you're talking about is simply a program that goes around and pulls information from other files, in your view, that's a document? Yes. If the document… What if you don't have that program on that particular computer, but the government can come up with an application, and what it does is it goes through every file on the computer and gives you a list of everything that has certain characteristics. Well, that takes us beyond this case, but the government can search every place on the computer… No kidding. The government can search every place on the computer that it has probable cause. So this business about the single document is really just a foil, right? I wouldn't call it a foil, Your Honor, because it's exactly what's at issue in this case. Do you have some idea for how to… I know your position is the government has the right to seize and use everything. You include the word use, and you include everybody who turns up on the same virtual document. But let's suppose that you don't sell that position because of concerns about privacy of people who are not the target of the search and not named in the warrant. Is there some practical way to preserve the privacy of other individuals while conducting an adequate search in accord with the warrant for the evidence on the named individuals? Well, Your Honor, in this case, I don't think it was possible for the agent not to have seen the positive drug test for the other players. As I keep saying, it was a single document. When he looked at that document, he saw that other players had tested positive for use of antibiotic steroids. I don't agree with that. Well, as I said, Your Honor, if he had chosen simply to print out all the documents, he could have flipped through it, and he would have seen it. How many pages was this document? It was several pages, Your Honor. More than one. Probably less than 20. I'm not sure exactly. More than one, but less than 20. Something like that. You didn't answer my question. Does the data that came up on the spreadsheet, did it come from one single file on the computer, or did it come from a bunch of different files? I don't want to have this engraved in stone, Your Honor, but it was my understanding that this document was created using the results of the drug test, so it was created as a single document. It wasn't Microsoft Excel to pull together financial records or something like that. So in the next case, they get smarter and they put this in different documents, like have an application that can pull it all together. Just like you get bigger monitors, and they put things in different files. Well, Your Honor, that's how medical records are often kept, in different files. I mean, usually your files are kept separate from Judge Kleinfeld's, et cetera, because medical files are generally kept in the name of the person. But your position, as I understand it, is that you wouldn't be bound by that either because files may be mislabeled and so on. So suppose that was true. Suppose what you had instead was the names of these people on a whole bunch of different files. Would you then say, OK, fine, you couldn't have looked at them at all? Well, I think if our search, if we looked at the first eight files of our search, or the first ten, I'm sorry, the first ten files we looked at for our players. Well, I understand that, but suppose there was a file that had 110 names in it, of which some were your players and some were not. Would you agree that you could only look at the sub-files of your players? I think it would depend on the organization. I think we could do a spot check to determine whether information that fell within the warrant was contained in those. I mean, that's generally the rule, is that you can look at a document. And your position is that you can do all of this completely unsupervised. In other words, it's totally up to the government how to do this. Well, yes, Your Honor, the government can seize documents or certainly view documents that are not within a warrant to determine whether they are within a warrant. So, if we go back to Tamura, what you're saying, you remember Tamura? Yes, Your Honor. So, can you look in the other folders, the files of the other patients? We can look, we can make a determination whether documents fall within the documents specified in the search warrant. And if the doctor has a document that has a list of all patients, your view is that you can look at everything on that page and use everything on that page? Yes. I mean, unless it has some information as to all patients.  I would add, though, Your Honor, that at some point, I think some presumption of regularity as to the documents would kick in. I mean, if we're looking at a file cabinet, a room full of documents, and then, you know, the agent determines that all the documents appear, all the files appear to contain documents for that person, at some point he has to- Do you have a different standard for-this is your self-labeling argument, correct? In terms of your rationale for not trusting file labeling. Is it a different standard for disinterested third parties and, say, defendants in a criminal case? The Fourth Amendment standard isn't any different, Your Honor. But as I was just stating, I think in searching the files of a disinterested third party, it may become apparent to the agents that, yes, all the documents are properly labeled, all the files are properly in the properly labeled files, and at some point he has to determine that it's no longer reasonable to continue searching. Well, but then I would anticipate, I mean, if, you know, if people-then it would be-then if you really want to get around the police, then you do practically-you do 99 percent of them correctly, and then you have one that's not. Well, again, you're asking about disinterested third parties, and we do not concede that CDT was a truly disinterested third party, but if it were a bank or, you know, some accountant or something that had no-that was truly disinterested, I think it would bear on the reasonableness of the search. But generally, you know- Why do you suggest that CDT was something more than a disinterested party? Well, because, Your Honor, they had an interest in not allowing access to all of their tests. They were not cooperating with the government. They were throwing up roadblocks to the government. You say they weren't cooperating, but really all they did was make a motion to quash, which hadn't even been heard yet. They did enter into an agreement with-I don't know if it was yourself or the head of the criminal division, the Department of Justice, to preserve all documents. You've made that argument to several courts, and it's just simply not true, and judges have made factual findings saying that is not true. Well, Your Honor, the 10-the key they were resisting was for the 10 players, and they now concede that we had the right to that. So I think there- But they never had their hearing. I mean, they never had the hearing before the search warrants, and you could have straightened all that out at the time, and then you could have gotten the material for the 10 people, and we wouldn't be here. I think the Supreme Court in Zerker made clear that if we have probable cause, we can proceed by warrant, even if we could also proceed by- So they were more than a disinterested party in some of their status because they were resisting? Because they were showing- You're not suggesting that they were in any way in cahoots with the Balko? No, Your Honor. I'm not suggesting that. If, for example-I guess the question is in terms of the Tamora notion that there are circumstances in which any determinations to look at material that was not specifically within the warrant, and I understand you think this document was specifically within the warrant, but it certainly contained information that was not the subject of the warrant, should be supervised by a magistrate or by a special master, as was proposed. If you had a law firm, for example, or a doctor's office, presumably they would be very reluctant to hand over this information and would be uncooperative in the same way. So does it make a difference when you're dealing with information that is at least arguably privileged by the holder of the privileged information? Well, this information was not privileged, Your Honor. Suppose it was a law firm? Typically in law firm cases, the government uses a taint to shield the investigators and the attorneys conducting the investigation. And why is this different? Just because it isn't formally privileged from disclosure, even though it's certainly a heightened privacy? The plaintiffs certainly had a privacy interest in the samples they provided, but they voluntarily provided those samples for testing for their own purposes. So we don't think that significantly diminishes their privacy interests. But counsel, why would it have been so difficult for the government under Tamora? Once you had the Tracy Directory to just, as has been suggested, set up a regular protocol with a magistrate judge and just say, okay, we've got this spreadsheet, however defined, and let the Major League Baseball players and others make their presentation. You make your presentation. If the government's position is correct, then you have no problem because you've got an independent magistrate ruling that the government has a right. The way you have it now, I mean, you understand the exponential concept that arises out of this would probably be frightening to most members of the public because there's no end to it. Medical records, school records, sexually transmitted diseases, whatever you call it, if it's on a computer somewhere and the government goes after one little nucleus, it can find any ganglia anywhere and trace it out ad infinitum without any limitation at all. Isn't that frightening to you? I don't think we're going that far, Your Honor. Why doesn't it go that far? Because all we're saying is that the government's Trust us. Sorry, Your Honor. Trust us. No, Your Honor, we're saying that we can look and Trust us. We won't do that. We're saying we'll only look in places where documents are likely to be found. That's the Fourth Amendment standard. I think you said that the reasonableness standard will be applied by the FBI agent who's doing the search as he looks through the records and determines what he thinks of the labeling and what's appropriate to look at. And I'm still trying to think of a way to have a neutral magistrate determine reasonableness as the Fourth Amendment contemplates in order to protect privacy interests. I can see so many applications. For example, you're investigating a doctor for Medicare fraud, and when you do, the FBI agents notice the names of people that they're just curious about. Oh, I suppose in this part of the country, Hollywood stars. And they start looking at their records. Well, it would just depend on the agent's reasonableness. Well, it would be unlawful for them to look in files where they could not. Well, it would be illegal, but once the horse is out of the barn, there would be nothing that you could do about it. So I guess if you had a magistrate judge here looking at this, do you think the magistrate would have given you, allowed you all the other files that you just happened to get out of this? We're only talking about one file in this case, Your Honor. Why is it illegal if the doctor keeps a spreadsheet of the names of the patients, how much was billed on the patient, and what condition, what medical conditions the billing was for? Because, Your Honor, your hypothetical was that we did it just out of curiosity about the name of the Hollywood star. Well, that's when you scroll. You see this Hollywood star, so you scroll and you look at what the condition was. Well, if it's in a single document, we can choose the document. So it's your representation that everything that ensued came out of that one document, that there was nothing else that Mr. Novitsky, if that was his name, looked at that led him to apply for the later warrants? Just that one document. It's actually more simple than that, Your Honor. He took the names from that document and put them in the May 6th West document. So that's really the only information we have at issue in this case, now that we've conceded that we did not timely appeal. I realize I'm taking over time, but I've got one last question, and that is, as I read the affidavits that Agent Novitsky filed in order to get the warrants, as I read them, he promised that this material that did not pertain to the 10 would be separated out and returned. He said that appropriately trained personnel would look through the documents to determine whether they fell within the search warrant. And the actual warrant says? That is part of the warrant, as I understand it. That it will be returned. If it's beyond the scope of the warrant, we will return it, Your Honor. But the warrant went to the 10 people, period. And our submission is that documents that contain the 10 people are within the warrant. You read that warrant an awful lot more broadly than I read it, and more broadly than Mr. Novitsky saw it. That's how warrants for documents have always been interpreted. I mean, we've never been forced to block out names on a document if they go beyond the names for which we have probable cause. KV, subsection. If the computer personnel determine that the data does not fall within any of the items to be seized pursuant to this warrant, or not otherwise legally seized, the government will return the items within a reasonable period not to exceed 60 days. And the document at issue in this case was a document within the warrant or a document? Your position is that the whole rest of the Tracy file, even though you did keep it until it was ordered to return, is not an issue now because it was subject to the other orders? Is that your position? Well, we only kept a copy of it, and it no longer is before the court because we conceded that we didn't timely appeal Judge Cooper's order. The only question is whether the search was unlawful so that our use of information from that search and the quest warrant paints that warrant. May I briefly address the magistrate judge question, Your Honor? The problem with having a magistrate judge involved in this is twofold. First of all, it's ungainly. The magistrate judge would take months to get up to speed, to understand the scope of the search, to understand what documents fell within the warrant. We would have to do this in not just this case but every case involving a warrant, and it would be unwieldy and magistrates would simply be unable to do it. Secondly, it would involve magistrates. You don't show much confidence in our magistrate judges. I can assure you they are quite competent. It's not a matter of competence, Your Honor. It's a matter of time. These investigations, this is the way investigations are done. You just told us there was one document. In this case, but the court has posed to me why we shouldn't use magistrate judges. But now you're going beyond this case. I'm happy to submit on this case alone, Your Honor. As I said, we have one document. Okay, thank you. Thank you. We'll hear from the other side. May it please the court. My name is Elliot Peters. I represent the Major League Baseball Players Association in this court, as I did in the courts below. I'll also be presenting argument today on behalf of comprehensive drug testing since we did file a joint brief. Is there really just one document? No. Because in the computer era, and I think Judge Kaczynski was on the right track, this is a spreadsheet which consists of material gathered from lots of testing of lots of different people at lots of different places at lots of different times. And it's organized by the computer. And computers in this age are able to slice and dice information and organize it for some different things. So if you put together a lot of information on a computer spreadsheet and then save it, you can call it a document in a computer, but it's not analogous to a single piece of paper, a single notation in a file, because it's being organized and preserved by the computer. Counsel, suppose hypothetically that the agent had said, well, I don't want to interfere with your business here. I'll just print out this spreadsheet that has the ten players. And he hit print under the menu, and it printed out the spreadsheet. Would it show the other players who had tested positive by name or code that the agent had? If he adjusted the computer, he could have printed out all kinds of different compilations of the data that the computer stores, including one he could have printed out, which had the test results for all the major league baseball players. Suppose he just said print all. Would it have just printed out a spreadsheet that would have been some reasonable number of pages, and it would have had the test results for all the players? In this case, Your Honor, if he had hit print all, he would have printed out the test results not only for baseball players, but for lots of other sporting competitions, lots of other sports leagues. That's what they seized. If he had printed all, they would have gotten so much private data. All, meaning the whole tracy file of this particular spreadsheet. If he had simply – this spreadsheet is what I'm talking about. He could have printed out a spreadsheet which contained the test results for all of the major league baseball players that were tested in 03. As I understand it, this is one spreadsheet he was looking at on the screen, and he hit the scroll bar and saw the test results. Is that right so far? There was a master directory which contained all of the test results for all of the players who were tested in 03. Is that the tracy directory? No, the tracy directory, Your Honor, is much larger. The tracy directory, which they seized and searched, contained test results for athletes in other sports leagues and in particular sports competitions, and it had a subsection of the tracy directory dealt with major league baseball. On this one, on this one that had the 10, what I'm leading toward is I want to know, suppose that the agent – suppose it is one piece of paper, a spreadsheet, and in addition to listing the 10 ballplayers, it lists a bunch of others, a bunch of other major league ballplayers and whether their urine tests were positive or negative for steroids. At that point, why doesn't the plain view doctrine apply, and why must an investigation that started with the 10 BALCO-connected players have to be limited to the 10 BALCO-connected players? I want to answer your question in a couple of parts. First of all, on the idea of one document, there was a document that the agents were given which contained the test results for the 10. They could have, and there's evidence in the record, they could have used the computer to search for all the test results for the 10. They could have gathered just the information they wanted that way. They could have followed it out. How could they have done that just quickly? Search, name search in the computer, and there's a declaration filed by a woman. A text search so that every file that had that person's name would… Right, and it would have taken less than an hour to search the entire tracing directory and come up with that specific information. And that wouldn't have depended on labeling, right? It would have been text search. You could have done a text search and found every name, and you could have done it that way, I suppose. Related to that, that is one of the questions I have. But related to that, there was something in the materials about how it might not have been coded by name, that there might have been different codes for the names, and was that accessible as well? Well, in this case, it all was names. It was names, okay. It was names, but I know the government has argued, well, we don't have to trust that, and that's why there was a computer specialist there to see, is there any trickery in the computer? Okay, and a related question to the plain error analysis, plain view analysis, on this big spreadsheet, which the government asserts is one document, or the tracing directory, did it list results that were both positive and negative? I mean, in other words. The master directory contained the name of every ball player. So, plain view, plain view, you wouldn't necessarily be coming up with wrongdoing. No, but plain view, what the agent did, and he says this in his affidavit dated April 30th, it's in ER 230 and 231, paragraphs 14 and 16. He went through the material on the directory. He actually looked for and found all the other positive tests for baseball players before he looked for all the thoroughly searched for the information on the pen he was supposed to be looking for. He first went in to find the information that he was not entitled to, and he says that in a declaration, because you can read the chronology of what he did. But the idea of plain view, because I haven't really answered Judge Kleinfeld's question, and I want to, The idea of plain view, when you're talking about computer media placed into a storage device, placed into a computer, the computer is turned on, and then, as Judge Bea observed, you're scrolling across to try and locate something, you're finding a name, you're finding a positive test result, you're matching the two. As Judge Ilson found, that's not a proper application of the plain view doctrine. It's not readily apparent that this is evidence of criminality. Judge Thomas analyzed it the same way in his dissent in the panel's opinion. This isn't a gun or a scale on the table. The plain view doctrine- Well, let me ask you about plain view in old-fashioned kinds of documents, and this is a similar question that I asked opposing counsel. Let's say that someone is authorized to look for documents proving counterfeiting on the part of John Doe, and you go into a bank or some other third party and you ask for documents relating to John Doe, and one of them is a single sheet of paper. At the top, it says, my friends who have robbed banks, and it has John Doe, but it has five other people. Is there plain view as to the other four? Well, Your Honor, I don't think that's the- In other words, can it be applied to an old-fashioned kind of document in that kind of context? Not if it requires analysis. If you have to read it, read it across the lines- Of course, you have to read it. It's words, but go with my hypothetical. At the top of the page, it says, my friends who have robbed banks, and it has five names, including the one that the warrant is for. What can the government do with the other four names? Well, I think if it were, in fact, a piece of paper, the government could seize that. The government could seize that piece of paper, most likely, under this court's 1976 opinion in the Bush case. It's different when you have a lengthy spreadsheet contained on a computer, and it's also different when you have privacy considerations. Your Honor, which pertain here, we really do believe, and this is where we differ from the government, that there have to be limits on what the government can do when it seizes a massive amount of information on a computer, and that the government has to be required to take some reasonable steps to minimize its exposure to materials that was plainly not authorized. We are now being encouraged, however, to look at this case as having nothing to do with the original massive seizure. In other words, I want to know whether you think that the question of whether they should have seized the Tracy file at all is one of the issues that we're dealing with now. Absolutely. We do not believe that they had a protocol in the warrant that said you should have a computer specialist there, make a determination, and then take it off-site and have the computer specialist look through this to search for what was identified for seizure. And the court identified it. It's subparagraph K in the warrant. And Judge Cooper found, the district judge who was determining the CDT search, that's not being appealed from or disputed. Judge Cooper found, as a matter of fact, that they violated that term of the warrant because they did not confine themselves to having a computer expert look through to simply find the data that they were entitled to. All right. Is that a preclusive finding now in the sense that it's a final district court judgment? That's not an appeal. So in terms of our determination now, do we redo that determination or do we accept it? There is a preclusive finding, but it's Judge Ilston's finding that the April 30th search warrant and the actual search of the Tracy directory was unlawful. That finding was made on August 9th before Judge Mayen ruled in Las Vegas. It was a final order of the district court. It is preclusive. To answer your direct question about Judge Cooper's finding, there's a split in the circuits about whether a prior order of the district court mandates collateral estoppel. The Orion case in this court suggests that it may not. There's Second Circuit law, which we cite the Grieve case in the Second Circuit, which says that it is. So there's a split. As to us. As to this court. There's a split. The Grieve is a Second Circuit case. But Judge Ilston's finding, from which there was no appeal, was. And remember what happened here. On April 8th, they seized the Tracy directory. And then they take it up to San Jose. We are, meanwhile, we've been at this for a while with the government. We submitted a white paper. We filed a motion to quash. We were on the phone with them and sending letters on April 8th. Both Mr. Bancroft and I sent them letters on April 8th saying, you've seized more than you're entitled to. Please put it in a box. Let's go to a magistrate judge. You're entitled to what you're entitled to, but let's do this in an orderly way. Let's not do an end run around this. This is very private stuff and we're very concerned about it. And they took it. I just want to very briefly. I don't want to. But they took it to San Jose. They went and they examined it. They used their examination of it to then go and get a new warrant before a different magistrate judge, to whom they reveal nothing about the grand jury litigation that's pending in the same court. Judge Ilston finds that that search is illegal. That is the search of the Tracy directory that we're mostly here talking about. That is the search that yields the list that's then attached to the grand jury subpoenas and that's attached to the search warrants that are executed on May 6th. That April 30th search is the one where they went in and actually searched the Tracy directory and got the other names. Now, and it's kind of representative of what's happened in this case. Now that they don't like the outcome from Judge Ilston, where they went to get authorization to search the Tracy directory for more baseball players, because they only had authorization before for 10, they say, no, we actually had that authorization from the beginning. But they went to Magistrate Judge Lloyd to get that specific authorization. They got it and Judge Ilston ruled that it was illegal and she ordered them to return everything but the 10 on August 9th, the first district judge to rule. Counsel, I am concerned about how to distinguish the situation here from two other situations that come up very frequently in our cases. One is when John Doe is suspected of selling cocaine to Richard Rowe, the DEA typically does a search and seizure where they take John Doe's pay and owe lists, address book, cell phone directory, and often turn up connections to others. And I think that pretty much always gets past the suppression motion. The other is in child pornography cases, where the government learns that John Doe has distributed illegal pictures to Richard Rowe and hundreds of others. So it then searches and seizes the computers of Richard Rowe and all of the hundreds of others and goes through them looking for child pornography but often discovers additional crimes. And how, it's basically the same problem as you're looking for illegal distribution by BALCO and you find all sorts of other crimes. How do you distinguish our case or should we rewrite the others? Well, Your Honor, that will be up to the court. But there's good law in this circuit that helps guide that situation. Here's the Temura case, which says that wholesale seizure for later... We've got it on lock now. And Temura is, I think, 1982. Computers have changed a lot since 1982. Go ahead. But the concept of saying we have more than we're entitled to here and we'd like to continue the search. The Temura procedure does make sense. At a grievous party like we did, we write them a letter and we say, come on, you're taking too much. Before they had even embarked on the search of the Tracy directory up in San Jose. And we said, let's go... The letters, it strikes me as kind of a rich man's procedure, frankly. You can hire lawyers and do negotiating and write letters if you have the money. But ordinary folks that are subjected to these searches and seizures can't. I'm looking for something simpler and more straightforward. Then I'll give the court another example from its own jurisprudence. The government filed a 20HA letter citing a case called Guyverson that involved a search of a computer. And they found they were looking for materials to make fake IDs. And the agents came across, or the computer specialist who was actually conducting the search, came across photographs that were child pornography, to stick with the court's example. They went back and got another warrant. They found more information. They presented it. And it wasn't the case agent. It wasn't Vitsky searching it with an eye towards, or what could advance my investigation? Can I find some other names here? Let me look for that. They had a computer specialist. He was looking for using a program to find information relating to making fake IDs. And he came across some photographs which were contraband because they contained child pornography. He called the AUSA. They set forth in a warrant to a magistrate what had happened. They got a warrant to do that. He came across more material. They applied for another warrant. But they did it in an orderly way that involved the intervention and the supervision of a court. That isn't what happened. And so I think the court's existing precedent is ample to handle this situation. That isn't what the agents did. Mr. Peters, can I change the focus just one little bit? As I understand it, this is a voluntary program by Major League Baseball. Is that correct? The 2003, yes, it was a voluntary program. Does Major League Baseball have a position on what would happen in terms of ball player participation were you to lose this case and the government had the ability to prosecute the additional 110 or whatever players it is that they found on the Tracy list? I represent the Major League Baseball Players Association and can speak for them and not for Major League Baseball, which is a different organization. However, there are grave concerns about our members in the event that a voluntary testing program, and the one in 2003 was supposed to be anonymous. It was just for purposes of gathering data to find out whether more than 5% of the people tested positive and then steps would be taken in the future to change the program. There were guarantees of confidentiality, anonymity. We have grave concerns and so does the United States Chamber of Commerce, which filed an amicus brief in support of our position about voluntary drug testing programs where typically that kind of material is going to be maintained in a database like so much medical information and that any drug testing program that's voluntary, if it's open to government perusal, any time there's probable cause to look at the records for one person, we have grave concerns about what that means for volunteers. Is there any doubt in the Major League Baseball Players' collective minds that no one who had any issues would never participate in such a program if there were the slightest doubt that it would be available to the government in such a search? We have grave concerns about that. And in this case, we have grave concerns about guarantees of confidentiality that were made as part of a collective bargaining agreement. And if we're just taking one more thing that I know just brings up another question, let's take a major business, let's take IBM, no offense to IBM, but just take IBM and say they decide they're going to test all of their employees because they don't want drug issues at work. Would the same kind of issues apply there? I think the exact same issues would apply there, and I think that that's what the Chamber of Commerce was speaking to is a concern that voluntary drug testing programs serve a valuable social purpose, and it would be a disincentive to do that and certainly to maintain any records of that kind of program if any time the government could have probable cause for one person. They do what the government says they're going to do here, gather it up, and then conduct investigations because that's what we heard today in response to the court's question. We're going to investigate every name of a positive person. Could you clarify the nature of the property interest that the players or the players' association have in the urine samples? I didn't see in the record any contrast or any state law that would give the players an ownership interest in those samples. Could you clarify that? Well, there's an agreement with Quest to perform the drug testing that they did and that the players' association represents the interests of the players. Yes, and did the players or did the players' association have any contractual ownership interest in the samples themselves because most state laws say that the laboratory owns the samples, not the individual. Your Honor, I don't know the answer to the question of whether there's a specific document that says that they had an ownership interest in the samples. It's our position that they had legally a privacy interest. But for 41G, the movement has the obligation to prove property interest, and so that's my question for the urine samples, whether there's any evidence in the record that the players own the urine samples. I just can't answer this. With a specific citation to the record, I'd be happy to review it and send in a letter because the issue of standing was raised in Nevada and resolved by Judge Mann in our favor that we did have standing. More generally about Rule 41G, I would like some enlightenment as to your understanding about the scope of that provision. It seems to have two pieces. First of all, with regard to Judge Acuda's question, it doesn't say anything about an ownership interest. It says that the person has to be aggrieved by an unlawful search and seizure of property, which is different from saying they have an ownership interest. And then it says may move for the property's return. It doesn't say return to whom. And it doesn't say anything about the government being able to keep unlawfully searched and seized property. So I'm trying to understand where that understanding comes from. Two answers. One, the Ramsden case, that's worth standing under Rule 41 to make a motion for return of seized property. It's a four-part test. Part one, callous disregard. Part two, an individual interest in and need for the property. Three, irreparable injury. And four, no adequate remedy at all. That's just for jurisdiction, correct? That's not the test for under 41G. That's just for pre-indictment equitable jurisdiction. That's the test under Rule 41 for a motion for return of property. In Ramsden, based on the Fifth Circuit case, we said we can exercise our equitable jurisdiction even in a pre-indictment setting, which 41G by its terms doesn't apply. Isn't that correct? That's exactly right, Your Honor. But Rule 41, on the issue that the government counsel began his presentation on, Rule 41, the commentary to the rule explicitly states that there are certain cases where the remedy of return of property without allowing the government to keep copies or to keep the property is appropriate. And the district courts, all three of them, found that this was such a case, and it's our position that that was not an abuse of jurisdiction. What disrupts the government's argument that 41G is not supposed to be a suppression of coercion? Well, I think that's really just a tag for the government. I mean, it's sort of a word to use the suppression. It's pre-indictment. It's not suppression in a case. We're not in a case we don't ever expect to be in, a criminal case. But effectively, this is what this would do. It would suppress and keep the government from using it in a criminal proceeding, and that is suppression. It would, and Rule 41 permits, authorizes the return of property, and the commentary specifically addresses the issue of certain extreme cases where the return of property does not, where the government is not allowed to keep copies. Does 41H limit it to suppression of property? Because 41G no longer has any suppression issue at all. Well, it's all in 41H where you're allowed suppression, to move for suppression. Is that correct in the structure of Rule 41? In the new rule that has been, that has not gone into effect yet? No, it's in 41H. Okay. What difference does that make? I mean, 41G says what it says. It says that a person aggrieved by an unlawful search or seizure may move for the property's return. And it doesn't say whether it's pre-indictment or post-indictment. It doesn't say even that it has to be a callous disregard. It just says that you can move for the property's return. I don't understand where all these overlays even came from. And that's what we did pursuant to Rule 41G. And why does it have to be callous disregard? Why can't it just be an unlawful search and seizure of property? Well, this court's... I understand that. I'm trying to understand it. I'm trying to understand where it came from and why it's there. I would be interested in your clearing up what the basis of our jurisdiction is. Since there's no criminal proceeding pending, is there... what is the basis of our jurisdiction for pre-indictment 41G motion? Rule 41. But that's a rule obviously can't give us jurisdiction. There would have to be some federal questions and constitutional basis and statutory basis. What is it? Isn't it connected to the original investigation, the Balco investigation? Isn't that how it works? The subpoena is the warrants were issued in connection with the Balco investigation. The warrants were issued in connection with the Balco investigation. That's the whole basis. That's what the applications state and that's what the panel opinions state was the basis for the government's action. It's sort of like an ancillary proceeding to the Balco investigation or the Balco criminal investigation. I think I'm getting led down a surprising path here. As I read Rule 41, there can be a successful motion for the return of property, whether it was the subject of an illegal search and seizure or a legal search and seizure. It can be a perfectly legal search and seizure, but the third party may still have good ground to insist upon the return of the property. No, that's absolutely right. But there are circumstances under Rule 41, say, because a business needs copies. I think in Ramston, we said, give back the papers. You can keep copies. And that involved a foreign investigation in Ramston. But there are certainly situations where motions are made for return of property based on Rule 41 because the business needs them. Yes. Because there's property that's needed. The business needs the computer. But in those cases, the government is allowed to keep copies of the evidence. Well, why wouldn't there be two rules? One, when you're doing it for those practical reasons of deprivation of property, yes, the government can keep a copy. But if the government acted unlawfully in the first place, I don't understand why the government gets to keep a copy, just without any egregiousness. It's unlawful. It shouldn't happen. Why do they get to keep it? Well, certainly in this case, where the government's conduct was found to involve callous disregard, violation of constitutional rights, and given the privacy interests, we think that to allow the remedy in this case, but to have the government enjoy all the... I understand that. I'm just trying to understand why you're putting all these qualifiers on when the rule doesn't seem to have the qualifiers. It basically says if you're an unlawful source in seizure, you can get your property back because it's unlawful, as I understand it. Not because it's callously unlawful or terribly unlawful. It's just unlawful. I just would be curious as to where these overlays came from. Well, I guess they came into this case from our reading, Ramstan. I understand that. I'd like to go back to a point you made much earlier in your argument. You said, well, what they could have done is done a search for the names, so the 10 names or 11 names of the computer. Now, let's say they had done that. Instead of opening the spreadsheet, they had done a search for those names. What would they have come up with? They would have come up with all of the test results for those 10 people. They would have come up with exactly what they were entitled to. Wouldn't they have come up with a spreadsheet? They would have come up with a different spreadsheet. They were handed that spreadsheet at 110 p.m. on the date of the search. I mean, as a practical matter, they were, and as Judge Thomas observed in his dissent in the panel opinion. I'm sorry, what do you mean they were handed it? They were given by a CDT employee a piece of paper with the test results for the 10 names, because it had been segregated because of the grand jury. Well, let's put that aside. I mean, let's say they have the computers or they have the data from the computers, right? They have the hard drive, and they do a search, and they look for the names of the 10 individuals. Okay? Something turns up. Wouldn't one of the documents that turns up be the saved spreadsheet document? No, because the computer would be perfectly capable of simply pulling out, searching that document and pulling out the test results for those 10 people. The computer could easily, particularly with a database, that's why databases exist. I don't think you understood my question, so let me just try again. Okay. They do a search for the 10 names, okay, and they then get a list of files, presumably files in the computer where these names appear, files where they have a list of test results or whatever. Why wouldn't one of those documents be the saved spreadsheet? I don't think if they would have gotten the document, they would have gotten the test results, because since these spreadsheets are just, they're just lists of test results. But you said earlier, in response to one of my questions, is that once you generate the spreadsheet and you save it, that creates a new document that has, in the computer, that has all the information in one file. Isn't that right? That's right. Why wouldn't that document come up when you search the computer for the names of the 10 players? I think if you search the computer, one thing you could do is search that document for the names of the 10 players. I understand. Well, that's not what I asked. But I'm not sure whether the computer, if you asked it to search by name, whether it would generate a list of documents. I'm just not sure whether... One last question, because you're over your time. If you pulled up the spreadsheet document, could you just print out, could you directly just print out the 10 names and not the rest? Yes. Off that spreadsheet? Yes. You could search that document for the names of the players by name. You would get the test results for those names. You could create a separate document and print it out. There's no need to print out the rest in order to get that document, in order to get the 10 off there. You do not need to. You only need to, I mean, if you want to, you can look at everything else. But if you want to confine yourself to what you're authorized to seize, you can ask the computer. Right at the outset, you could have gotten just those 10 names off that document. They could have gotten just those 10 names off that document, and they had the document with the 10 names already. Yes, the truth is they had a piece of paper with those 10 names before they left the place. They had it at 110 in the afternoon. They had that piece of paper before they even decided to seize the Tracy directory. That's in Agent Nowitzki's report, which is in the record. And at ER 135 is where he says that they got the list right after 1 o'clock. They had to trust CDT that that was a complete list. They would have had to trust, and it turned out it was. But I understand the court's point, that then they could have confirmed it with a word search. That's why they really could have done it that afternoon at CDT. They had the document. They were looking only for 10 names. They could have run that search right there on the computer. But all they wanted to know, really, was whether these 10 people tested positive. Those 10 people tested positive or negative, and they knew that. So what else do they need to know? That's all they were entitled to know. Right. So why is it not to trust? I mean, they had the information that they needed. But they were entitled to, according to the warrant. Well, what would the government's position be if they had given that in the first place and not made a privacy claim that wasn't legally cognizable that would have been more trustworthy? But if you go ahead with a search warrant, then sometimes they're going to fall on some other stuff. Understood. But I've never understood the idea that because the Baseball Players Association and CDT engaged in discussions with the government, made assurances to them, and then filed a motion to quash that that was noncompliance with a grand jury subpoena. It seemed to me to be complete compliance, which is presenting our views in an orderly, timely way to a district judge. Well, if you claim privacy interests that say are not cognizable under the law, then does that make you more or less trustworthy, ultimately, when they go in and do a search warrant? Well, maybe I don't understand the court's question. I think that the Supreme Court has resolved in Ferguson and Skinner that there are privacy interests associated with the testing performed on bodily fluids. But maybe I'm not. Well, I guess, though, that resisting for the 10. I mean, did they have a legal ground to stand on for the 10? We got subpoenas for everything. I mean, it's sort of the whole discovery thing that it's, you know, we get it after everyone. Yeah, if everyone works things out great, then, you know, then no one loses an eye. But then when they don't, then it comes here, and then we have to sort it all out. Here's what happened. We got a subpoena for every – the testing results for every baseball player. Then we began negotiations. We expressed concerns about that under the law, under privacy, for privacy reasons. Then we got a more narrow subpoena. We said, are you withdrawing the prior subpoena? They said, no, you still have to preserve all of that. We said, if you only want the 10, but you reserve the right next week to give us another subpoena for every single baseball player, and we've got privacy concerns, we've got to present those to the court. That's exactly what we did on April 7th, and then the next day they went in and got everything. And I do think, you know, the Reddick case, which is an older case in the circuit, talks about situations where the government has a warrant, but the circumstances cause the district court to conclude that maybe they were after a little bit more than they were authorized to. And this is a case where the district courts make factual findings along those lines, which we believe were not clearly wrong. Okay, thank you. Thank you very much. The government's out of time. We'll leave you a couple of minutes for a bottle if you would like to take it. A couple of quick points. There was a question early on about whether the list C is contained positive and negative drug tests. The list is at 4B in the government's excerpts, and it contains only positive drug tests. On the question of key searches or ways of searching computers, first of all, the warrant in this case went beyond the ten names. It included manuals and other materials related to the drug testing, and just giving us the ten names would not have satisfied the warrant. Secondly, we would submit that you cannot key the Fourth Amendment reasonableness to the method of searching. There are documents created now that are not word searchable, that are simply documents that will not turn up if you use a keyword search. It's not clear, you know, how those documents will be used in the future. For example, PDF documents, some can be searched for words, some cannot. We would submit that making the Fourth Amendment analysis. Why not? I mean, if we were trying to minimize intrusion and yet get the government whatever it was entitled to, why wouldn't we, at least when we're talking about large databases like this, from third parties which elevated privacy concerns just as a subgroup, why wouldn't we try to have computer people involved in making determinations about how it can be done less intrusively? Why do we need to sanction the broadest possible way to do it if there's a narrow one? Well, Your Honor, I think that the question is, it's not clear in this case whether using a keyword search would have turned up anything different, in particular if it was a documented issue. So I think it is quite clear that a narrower and less intrusive means would have been available. Well, a keyword search for the names, in our view, would have brought up the document that that's an issue in this case. But I don't understand you in this case to be arguing that there was no narrower means available to you. Well, we are arguing that, Your Honor, because there are documents in the warrant covered by the warrant beyond the records of the ten baseball players. Why wasn't your search all done once they gave you the test results for the ten players? Because the warrant included items beyond the ten players. You're talking about manuals, though, and other how they conducted methodology and whatnot. The other thing was manuals. It wasn't dirty urine for other players. It was more general instruction manuals. And documents related to how the searches were conducted, the relationship between the two. Yes, and none of that includes whether the test was positive or negative on the urine of another player. That's correct, Your Honor. But if we had been handed a list of ten names, the minute we walked in the door, we still would have had the right to search the warrant for other materials. Not this spreadsheet because it was redundant. We could have looked for manuals and all those things, but it wouldn't have been the test results. Well, we would have been able to look in the computer files for those manuals in some way or another. And whether it would have been possible to come up with a procedure to do that, I don't know. There's no record on that. I keep thinking of other cases that are much more common, and they involve people much less able to protect themselves. I'm thinking you suspect somebody of using narcotics, and you go to their psychiatrist's office and to the Quest office to find out about their blood tests. Of course, they don't want to give them to you unless they have a search warrant or subpoena or something like that so that they won't get sued for it. Once you get it, they give it to you. And they don't want you going through all their files and computers and whatnot because it turns up everybody else in town's blood tests. You go and look for them anyway? If we have a search warrant issued by a magistrate, Judge, we can look. Well, it depends on what the search warrant says. A search warrant can never be general. That's correct. And the Supreme Court in Zerker said magistrates should tailor search warrants to be no broader than necessary. Well, if the search warrant says you can look for the instruction book, that doesn't mean you can look at other people's urine tests. Well, we can look for it. We can look in the computer files to the extent necessary to find what's within the warrant. OK, thank you. The case is argued. We'll cancel it. Adjourned.
judges: Kozinski , Kleinfeld , Graber, Wardlaw , Fletcher, Paez , Berzon , T. Bea , M. Smith, Ikuta